**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>WILLIE JUNIOR CARTER,<br>Defendant. | No. 17-CR-2045-LRR<br>**REPORT AND RECOMMENDATION** |

---

## *I. INTRODUCTION*

This matter is before me pursuant to Willie Junior Carter's ("defendant") motion to suppress evidence allegedly obtained in violation of the Fourth Amendment to the United States Constitution. (Doc. 292). The grand jury charged defendant in two counts of a fourteen-count Superseding Indictment. (Doc. 170). Count One (1) charges defendant with Conspiracy to Distribute Cocaine and Cocaine Base in violation of Title 21, United States Code, Section 846. (*Id.*). Count Thirteen (13) charges defendant with Possession with Intent to Distribute Cocaine Base in violation of Title 21, United States Code, Section 841(a)(1). (*Id.*). Defendant seeks to suppress evidence stemming from a January 12, 2017, traffic stop of defendant in Waterloo, Iowa, arguing that the officer lacked reasonable suspicion to initiate the traffic stop. (Doc. 292, at 3).

The Honorable Linda R. Reade, United States District Court Judge, referred this motion to me for a Report and Recommendation. On May 21, 2018, I held an evidentiary hearing on defendant's motion at which Waterloo Police Officers Albert Bovy and Michael Girsch, and Cedar Rapids Police Officer Brian Furman testified. I admitted into

evidence government exhibits that included videos of Waterloo police camera footage of the traffic stop (Exhibits 1 & 2), a CD containing audio recording clips of intercepted phone calls, transcripts of those calls and SMS text messages intercepts, and letters from cellphone provider Sprint identifying the subscriber information for the telephone numbers identified in the intercepted phone calls.

For the following reasons, I respectfully recommend the Court **deny** defendant's motion to suppress.

## *II. FINDINGS OF FACT*

From October 2016 through January 2017, a task force of counter-narcotic agents conducted wiretap surveillance of William Campbell, a known distributor of crack cocaine in Waterloo, and a co-conspirator in this case. Between approximately the fall of 2016 through January 2017, the agents intercepted a series of text messages and phone calls between two cellphone numbers, one belonging to Campbell and the other to defendant. The series of intercepted messages and calls culminated in a call on January 12, 2017, at 1:02 PM, that led agents to believe that defendant would be obtaining drugs from Campbell later that day. Task Force Officer Furman testified that he identified the male voice on the January 12, 2017 intercepted call as defendant's because defendant was a "daily caller," with Campbell and because Officer Furman also recognized the incoming phone number as one previously identified as belonging to defendant's cellphone through records checks. (Exhibit 150, page 7). Officer Furman was unaware of anyone other than defendant using that phone number previously. The call on January 12, 2017, at 1:02 PM involved a discussion between Campbell and defendant about the number of phone calls defendant had received and the number of calls he anticipated receiving that day, a discussion about money, and a plan for defendant to go to Campbell's residence. (Exhibit 411 & 411A).

Based on his interpretation of the conversation, Officer Furman informed Officer Girsch, a member of the counter-narcotics task force, that it was likely that defendant would be going to Campbell's house to engage in a drug transaction. Officer Girsch ordered other officers to surveil Campbell's house, and at approximately 1:55 P.M., a surveillance officer saw a gold Monte Carlo coupe arrive at Campbell's house. Officer Girsch testified that the same officer that saw the Monte Carlo arrive saw a male matching defendant's description exit the car and enter the residence. Approximately twenty minutes later, the same male exited the house, got into the Monte Carlo, and drove to a residence on Columbia Street. That officer, however, was unable to positively identify the male as the defendant. Officer Girsch testified that he believed that defendant had a family connection to the residence on Columbia Street.

At approximately 2:25 P.M, roughly ten minutes after arriving at the address on Columbia Street, the same male left the house and got into the gold Monte Carlo and drove toward West Parker Street. When the male left the house on Columbia Street and got into the Monte Carlo, Officer Girsch was able to positively identify the male as defendant. Officer Girsch testified his positive identification was possible because Officer Girsch had previously arrested defendant, and had frequently observed defendant and the gold Monte Carlo at the Campbell residence after intercepted drug-related calls. Officer Girsch was aware that defendant did not possess a valid driver's license.

Officer Girsch contacted Officer Bovy, who was on patrol duty, and informed Officer Bovy that defendant was driving without a license and that Officer Bovy was to conduct a traffic stop of defendant if possible. Officer Girsch testified that he did not recall telling Officer Bovy of a drug-related rationale for stopping defendant, only that defendant did not have a valid driver's license. Officer Bovy testified that he confirmed that defendant was, in fact, barred from driving by checking defendant's information on Officer Bovy's in-car computer. Officer Bovy also testified he looked at defendant's

arrest picture on the in-car computer. Officer Bovy did not recall any prior interactions with defendant.

Shortly after receiving the order from Officer Girsch to stop defendant, Officer Bovy observed a gold Monte Carlo matching Officer Girsch's description in the vicinity of the intersection of Newton Street and Ashland Avenue. Defendant was driving south on Ashland Avenue while Officer Bovy was approaching the intersection driving west on Newton Street. Officer Bovy observed the driver of the Monte Carlo attempt to come to a stop at the Newton Street and Ashland Avenue intersection. It was an uncontrolled intersection, meaning that there were no stop signs on either street. Officer Bovy arrived at the intersection prior to defendant, and thus defendant should have yielded to Officer Bovy's vehicle. Officer Bovy testified that the Monte Carlo was traveling too fast for the icy and snow-covered road conditions, preventing the vehicle from coming to a stop. Officer Bovy testified that he observed the car's wheels lock up as the car slid through the intersection. Officer Bovy testified that had he not slowed down, defendant would have collided with Officer Bovy because defendant was driving too fast. Officer Bovy testified that based on his experience defendant's speed combined with the icy road conditions would have prevented defendant from stopping in time to avoid a collision. As the Monte Carlo slid through the intersection, Officer Bovy visually identified the driver as defendant, based on Officer Bovy having viewed the arrest photograph immediately prior on his in-car computer.

Officer Bovy turned onto Ashland Avenue behind defendant and activated the top lights of his marked patrol car. After Officer Bovy activated the top lights on his patrol car, defendant did not immediately pull to the side of the road, but proceeded approximately one-half of a block to Kern Street. While attempting to stop at the stop sign on Kern Street, defendant slid past the sign before coming to a complete stop.

Defendant then made a right turn onto Kern Street and stopped approximately three-quarters of a block away from the intersection.

Officer Bovy got out of his patrol car, approached the gold Monte Carlo, and when at the driver's window asked, "Aren't you Willie Carter?" Defendant responded, "Yes I am, Sir." (Exhibit 2). Defendant also acknowledged to Officer Bovy that defendant did not have a license. (*Id.*).

Officer Bovy testified that he directed defendant to turn off the car and hand over his car keys because Officer Bovy believed that defendant might attempt to drive off. Officer Bovy testified that defendant was sweating profusely despite the cold temperatures, and that defendant was acting nervous. Officer Bovy testified he requested back-up because he believed that defendant might flee based on the circumstances. After another officer arrived, Officer Bovy instructed defendant to get out of his car. Officer Bovy believed he saw defendant put something between the seats and asked defendant about it, but defendant denied putting anything between the seats. The officers then attempted to handcuff defendant. Defendant spun free and ran from the officers, but was tackled when he slipped in the snow a few houses down the street, at which point officers were able to handcuff defendant. Officer Bovy testified that during a post-flight pat down, Officer Bovy discovered a bag containing approximately 12 grams of cocaine base in defendant's pocket.

Following defendant's arrest, Officer Girsch interviewed defendant at the police station. Defendant made incriminating statements. Specifically, defendant admitted to possession of the cocaine base and intending to distribute the cocaine base, and further implicated himself in a conspiracy with other members of the Campbell Drug Trafficking Organization.

I found all three of the officers to be credible witnesses. This is based in part on my observations of the demeanor of the officers during their testimony. All officers

admitted when they did not know the answers to certain questions. Further, both Officer Furman and Girsch were able to explain the specifics of the wiretap information provided by the Task Force. Specifically, Officer Girsch and Officer Furman testified that some of the Exhibits state "unidentified male," instead of identifying defendant as the user of the intercepted cellphone number. The officers, however, testified they were able to correlate the intercepted communications to defendant through prior personal experience with defendant or the use of a master list maintained by the task force associating cellphone numbers with identified individuals. Moreover, the testimony of Officer Bovy was supported by camera footage from the in-car dash cam and his body camera. (Exhibits 1 & 2).

### *III. ANALYSIS*

Defendant argues that the officers lacked reasonable suspicion to initiate a legal traffic stop on January 12, 2017, and that all evidence stemming from the stop should be suppressed. Defendant's position is that the circumstantial evidence of the wiretapped conversations and the arrival of the gold Monte Carlo at the Campbell residence was insufficient probable cause to stop defendant. Because there are two other, separate grounds to provide reasonable suspicion to justify the arrest of defendant, it is unnecessary to reach the issue of whether the evidence from the wiretap alone would have provided reasonable suspicion for officers to stop defendant's car. I find that officer Bovy had reasonable suspicion to stop defendant's car based on the traffic violations (sliding through intersections and driving too fast for weather conditions) and based on defendant driving without a license. Moreover, defendant's subsequent resistance to arrest and flight provided independent probable cause to arrest defendant and thereafter search his person incident to arrest.

### *A. Traffic Stop*

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." It is well established that a traffic stop constitutes a seizure for Fourth Amendment purposes. *Whren v. United States*, 517 U.S. 806, 809-10 (1996). A traffic stop is lawful if supported by probable cause or reasonable suspicion that a traffic violation has occurred. *United States v. Washington*, 455 F.3d 824, 826 (8th Cir. 2006). "Even a minor traffic violation provides probable cause for a traffic stop." *United States v. Harris*, 617 F.3d 977, 979 (8th Cir. 2010). The reasonable suspicion standard "is a fact-specific inquiry based on the totality of the circumstances in a particular case." *United States v. Riley*, 684 F.3d 758, 764 (8th Cir. 2012). "While 'reasonable suspicion' must be more than an inchoate 'hunch,' the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." *United States v. Fuse*, 391 F.3d 924, 929 (8th Cir. 2004).

Defendant argues that Officer Bovy had no objectively reasonable suspicion to conduct a traffic stop on the gold Monte Carlo. (Doc. 292, at 3). I conclude that Officer Bovy had reasonable suspicion to initiate the traffic stop for three independent violations: (1) driving without a license; (2) failure to maintain a safe speed, and; (3) failure to appropriately stop at a stop sign.

Iowa Code Section 321.174 (2015) states that a person "shall not operate any motor vehicle . . . unless the person has a driver's license issued by the department valid for the vehicle's operation." Officer Bovy was aware that defendant was not authorized to drive and Officer Bovy observed defendant driving. Officer Bovy's testimony is confirmed by the dash camera from his patrol car. (Exhibit 1). Therefore, I find Officer Bovy had not only reasonable suspicion, but probable cause to believe that defendant was in violation of Iowa Code Section 321.174 prior to conducting the traffic stop.

Additionally, Officer Bovy testified to observing the gold Monte Carlo slide through the intersection of Ashland Avenue and Newton Street before Officer Bovy initiated the traffic stop. Pursuant to Iowa Code Section 321.285 (2018), it is a simple misdemeanor to drive at a speed greater "than is reasonable and proper" for the "conditions then existing." Iowa Code Section 321.288 (2012) mandates that a driver "shall have the vehicle under control at all times." The intersection of Newton Street and Ashland Avenue is uncontrolled, and because defendant was to the right of Officer Bovy, had the two cars arrived at the intersection at approximately the same time, Officer Bovy would be required to yield to defendant. Officer Bovy, however, testified that he arrived at the intersection prior to defendant, and thus defendant should have yielded to Officer Bovy's vehicle. Officer Bovy testified that had he not slowed his patrol car, however, defendant would have collided with Officer Bovy because defendant was driving too fast. Officer Bovy testified that based on his experience, defendant's speed combined with the icy road conditions would have prevented defendant from stopping in time to avoid a collision. Officer Bovy further testified that he observed the gold Monte Carlo's wheels lock up as the car slid into the intersection. As noted, I found Officer Bovy a credible witness and his testimony is supported by his patrol car dash camera. (Exhibit 1). Therefore, I find Officer Bovy had probable cause to believe defendant was in violation of Iowa Code Sections 321.285 and 321.288, thereby establishing a second independent basis for stopping the vehicle.

Finally, pursuant to Iowa Code Section 321.322 (1979), the driver of a vehicle "shall stop at . . . either the clearly marked stop line or . . . before entering the intersection . . . ." Officer Bovy testified that after turning on his patrol car lights to stop defendant, defendant slid past a stop sign prior to coming to a stop. Officer Bovy's testimony is supported by the dash camera footage. (Exhibit 1). For Fourth Amendment purposes, seizure of a person pursuant to a traffic stop begins the moment the vehicle

comes to a halt on the side of the road. *Brendlin v. California*, 551 U.S. 249, 263 (2007). *Brendlin* clarifies the point in time that the seizure has definitely commenced, however, there is still ambiguity as to whether the seizure exists prior to the vehicle halting, i.e. that the required probable cause or reasonable suspicion existed prior to the seizure commencing. Although Officer Bovy was in the process of attempting to stop defendant at the time defendant violated Section 321.322, defendant had not yet yielded to police authority. Therefore, I find that the violation of Iowa Code Section 321.322 may provide a valid independent basis to stop defendant.

In short, I find Officer Bovy had probable cause to believe that defendant was in violation of at least three different Iowa traffic laws. Therefore, I find the traffic stop was valid under the Fourth Amendment.

***B. Defendant's Flight After Initial Traffic Stop***

Alternatively, defendant's attempted flight after the traffic stop establishes an additional and independent basis for the arrest and subsequent search of his person, the police interview, and defendant's incriminating statement. "[A] defendant's response to even an invalid arrest or *Terry* stop may constitute independent grounds for arrest." *United States v. Dawdy*, 46 F.3d 1427, 1431 (8th. Cir. 1995). In *Dawdy*, the defendant, while being handcuffed, resisted arrest and attempted to flee. *Id.* at 1428. Iowa Code Section 804.12 (1978) states that "a person is not authorized to use force to resist an arrest . . . even if the person believes that the arrest is unlawful or the arrest is in fact unlawful." This attempted resistance was sufficient to establish probable cause for an arrest under Iowa law. *Dawdy*, 46 F.3d at 1431. Here, while Officer Bovy was attempting to handcuff defendant, defendant attempted to run. Similar to *Dawdy*, defendant's resistance to arrest violated Iowa Code Section 804.12 and provided Officer Bovy with an independent basis for the arrest separate from the wiretaps and the traffic violations. Officers seized the evidence defendant seeks to suppress subsequent to

defendant's flight. Therefore, I find that defendant's resisting arrest created sufficient probable cause to arrest defendant. When an officer arrests a person, the officer may search the person incident to arrest, which includes reaching into clothing pockets. *United States v. Robinson*, 414 U.S. 218, 226, 236 (1973). Therefore, the evidence officers seized after defendant's flight and lawful arrest was not the fruit of an unconstitutional seizure.

Having found both the traffic stop and the search following defendant's attempted flight to be lawful, I find no basis to suppress evidence gained from defendant's stop.

## ***IV. CONCLUSION***

For the reasons set forth above, I respectfully recommend the Court **deny** Defendant's Motion to Suppress. (Doc. 292).

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and FED. R. CRIM. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* FED. R. CRIM. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED** this 30th day of May, 2018.

C.J. Williams
Chief United States Magistrate Judge
Northern District of Iowa